b

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

DOUGLAS BRUCE HOLLY          CIVIL ACTION 1:17-CV-00970

VERSUS                       JUDGE JAMES

U.S. COMMISSIONER OF         MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY

---

### REPORT AND RECOMMENDATION

Before the Court is Douglas Bruce Holly's ("Holly's")[1] appeal of the denial of disability insurance benefits ("DIB") by the Commissioner of Social Security ("the Commissioner"). Because substantial evidence does not support the ALJ's findings that Holly and his physicians are not credible, the Commissioner's decision should be reversed and Holly should be awarded benefits.

## I.   Background.

Holly filed an application for DIB, alleging a disability onset date of December 28, 2014 (Doc. 10-1, p. 139/421), due to "hole in heart, asthma, sleep apnea, bone spur in left heel, heart murmur, acid reflux, and shortness of breath." (Doc. 10-1, p. 57/421). That application was denied by the Social Security Administration ("SSA"). (Doc. 10-1, p. 66/421).

---

[1] Holly's name is spelled variously as "Holly" or "Holley" throughout the administrative record. Neither the Social Security Administration nor Holley's attorney have been consistent in their spelling of his name, his medical records and earnings records bear both spellings, and Holly has used both spellings in his signatures (Doc. 10-1, pp. 94, 96, 128, 185/421). Since this case was filed and docketed under the name "Holly," that is the spelling used herein.

A de novo hearing was held before an Administrative Law Judge ("ALJ") on March 23, 2016, at which Holly appeared with his attorney and a vocational expert ("VE").  (Doc. 10-1, p. 37/421).[2]  The ALJ found Holly has not engaged in substantial gainful activity since December 28, 2014, the alleged onset date.  (Doc. 10-1, p. 25/421).  The ALJ further found that, although Holly has severe impairments–chronic obstructive pulmonary disease ("COPD") and obesity–he has at least a high school education and has the residual functional capacity to perform the full range of light work.  (Doc. 10-1, pp. 25, 27, 31/421).  The ALJ found Holly is unable to do his past relevant medium and heavy work as a laborer, deckhand, corrections officer, and green chain off-bearer (at a plywood plant).  (Doc. 10-1, pp. 30-31/421).  Because a finding of "not disabled" was directed by § 202.20 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ found Holly was not disabled at any time through the date of his decision on December 28, 2014.  (Doc. 10-1, p. 31/421).

---

[2] To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Holly (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  See Greenspan, 38 F.3d at 237.

Holly requested a review of the ALJ's decision, but the Appeals Council declined to review it (Doc. 10-1, p. 4/421), and the ALJ's decision became the final decision of the Commissioner.

Holly then filed an appeal for judicial review, with the following grounds for relief (Docs. 15, 16):

1. The ALJ's reasons for not crediting the opinion of Dr. Davis, Holly's treating cardiologist, are not supported by substantial evidence.

2. The ALJ's findings as to Holly's credibility are not supported by substantial evidence.

3. The ALJ's finding that Holly retains the residual functional capacity to perform the full range of light work is not supported by substantial evidence.

II.    **Evidence.**

A.    **Holly's medical records.**

Dr. Gregory Ardoin, a pulmonologist, first saw Holly in May 2014 on referral from Dr. Karson. (Doc. 10-1, p. 371/421). Holly complained he had been progressively shorter of breath for years but was markedly worse in the last "many months"; his shortness of breath was aggravated by exertion, relieved by rest, and accompanied by coughing and wheezing, and he had been very tried for the last year. (Doc. 10-1, p. 371/421). Dr. Ardoin noted Holly's history of a bilateral heart catheter, pulmonary hypertension, and severe dyspnea on exertion, with progressively worsening shortness of breath for years, markedly worse in the last several months. (Doc. 10-1, p. 371/421). Dr. Ardoin noted that Holly has significant left ventricle hypertension and hypertrophic cardiomyopathy with normal left ventricle function, asthma with

wheezing, hypersomnolence, and snoring. (Doc. 10-1, p. 371/421). Holly could not make it up and down stairs at work without severe distress. (Doc. 10-1, p. 271/421). Dr. Ardoin diagnosed pulmonary artery hypertension, atrial septal defect ("ASD"), hypertrophic cardiomyopathy, dyspnea on exertion, morbid obesity, asthma, and hypertension. (Doc. 10-1, p. 372/421).

Holly, then 42 years old, underwent an echocardiogram in June 2014. (Doc. 10-1, pp. 333-334/421). Holly's left ventricle ejection fraction was about 59% and the wall thickness was at the upper limits of normal; there was mild regurgitation in the pulmonic valve; there was mild to moderate regurgitation in the tricuspid valve; and everything else was normal. (Doc. 10-1, p. 334/421). Cardiopulmonary tests and pulmonary function studies revealed pulmonary hypertension. (Doc. 10-1, pp. 335-345/421). Dr. Ardoin stated Holly's case was very unusual due to a right heart catheter, documented in August 2013. (Doc. 10-1, p. 368/421). Holly's cardiothoracic surgeon recommended trying medications for a while before trying to close the atrial septal defect, so Dr. Ardoin prescribed PDE5 inhibitors to help his hypertrophic diastolic dysfunction. (Doc. 10-1, p. 370/421). Dr. Ardoin diagnosed pulmonary artery hypertension, atrial septal defect, hypertrophic cardiomyopathy, dyspnea on exertion, morbid obesity asthma and hypertension. (Doc. 10-1, p. 368/421).

In July 2014, Holly had an abnormal pulmonary function study. (Doc. 10-1, pp. 346-/421). Dr. Ardoin noted that Holly said he felt markedly better since treating his asthma with Advair and Spiriva, but was not at normal exercise capacity at work, and his cardiopulmonary exercise test was "remarkably abnormal for both ventilatory

limitation…and from his hypoxemia". (Doc. 10-1, p. 265/421). Dr. Ardoin diagnosed shortness of breath, exercise hypoxemia, pulmonary artery hypertension, COPD, atrial septal defect, asthma, dyspnea on exertion, morbid obesity, and hypertension. (Doc. 10-1, p. 266/421).

A sleep study in July 2014 showed Holly has severe obstructive sleep apnea syndrome. (Doc. 10-1, p. 347/421). Holly was prescribed a positive airway pressure therapy titration trail study. (Doc. 10-1, p. 347/421). A second sleep study in September 2014 showed his obstructive sleep apnea was controlled by CPAP and he was prescribed home CPAP therapy. (Doc. 10-1, p. 348/421).

An echocardiogram in September 2014 showed Holly's left ventricle had mildly increased wall thickness, his left and right atriums were mildly dilated, and his pulmonic and tricuspid valves had mild to moderate regurgitation. (Doc. 10-1, pp. 349-50/421). Holly's left ventricle ejection fraction was 62 %. (Doc. 10-1, p. 350/421).

Holly had another abnormal spirometry report in October 2014. (Doc. 10-1, p. 352/421). Holly was called to undergo a repair of his atrial septal defect, but he refused it. (Doc. 10-1, p. 362/421). Holly stated he was able to do his work with mild to moderate compromise, which was a marked improvement. (Doc. 10-1, p. 362/421). Dr. Ardoin noted Holly still had trace edema and had started CPAP therapy. (Doc. 10-1, p. 362/421). Dr. Ardoin diagnosed Holly with atrial septal defect, exercise hypoxemia, pulmonary artery hypertension, shortness of breath, pulmonary artery hypertension ("PAH"), chronic obstructive pulmonary disease ("COPD"), asthma,

hypertrophic cardiomyopathy, dyspnea on exertion, morbid obesity, hypertension, and obstructive sleep apnea on CPAP.  (Doc. 10-1, pp. 262-63/421).

In December 2014, Holly had a blood vessel pop (Doc. 10-1, p. 244/421).  Holly's history of benign hypertension was noted (Doc. 10-1, p. 244/421), and he was diagnosed with varicose veins and morbid obesity.  (Doc. 10-1, p. 245/421).

Holly saw Dr. Ardoin three times in January 2015.  Holly was treated for an upper respiratory infection, and a heart murmur was noted (systolic grade III/IV in LUSB), as well as edema and morbid obesity.  (Doc. 10-1, pp. 248-49/421).  Holly reported a long history of heart murmur since age 4 after having open heart surgery.  (Doc. 10-1, p. 249/421).  Holly underwent an EKG, lab work, x-rays, a cardiopulmonary, and pulmonary function studies at the request of Dr. Gregory Ardoin, a pulmonologist.  (Doc. 10-1, pp. 267-284, 297-302/421).  Holly was 5'10" tall and weighed 289 pounds.  (Doc. 10-1, p. 258/421).  Dr. Ardoin diagnosed shortness of breath; gastroesophageal reflux disease ("GERD"); ASD; hypertrophic cardiomyopathy; obstructive sleep apnea on CPAP; asthma; morbid obesity; dyspnea on exertion; pulmonary artery hypertension; and exercise hypoxemia.  (Doc. 10-1, p. 258/421).  Dr. Ardoin found Holly's asthma, reactive airways disease, and obstructive lung disease had improved markedly, and his pulmonary hypertension "may have improved somewhat."  (Doc. 10-1, p. 259/421).  Dr. Ardoin noted that Holly's primary limiting factor is hypoxemia with exercise, and his second most limiting factor is hypertrophic cardiomyopathy/diastolic dysfunction.  (Doc. 10-1, p. 159/421).  Dr. Ardoin found Holly was unable to do physical labor (his usual work requirements)

6

without respiratory distress due to hypoxemia. (Doc. 10-1, p. 258/421). Dr. Ardoin recommended that Holly stop working, since he was doing physical labor, but Holly said he could not. (Doc. 10-1, p. 359/421).

Holly was referred to Dr. Wesley W. Davis, a cardiologist, in April 2015. (Doc. 10-1, p. 402/421). Holly was 42 years old, 69" tall, weighed 310 pounds, and his blood pressure was 118/63. (Doc. 10-1, p. 402-404/421). After Holly underwent tests, Dr. Davis diagnosed primary pulmonary hypertension, obesity, hypertension, and asthma. (Doc. 10-1, p. 404/421).

In June 2015, Dr. Davis noted Holly's "leaking valve" (since open heart surgery in1976) and asthma. (Doc. 10-1, pp. 406-407/420). Dr. Davis found Holly had pitting edema in both lower extremities (more om the right) and varicose veins. (Doc. 10-1, p. 408/421), and is disabled due to hypertension, chronic stasis changes (right leg more than left), obesity, his ASD repair at age 4, edema, and moderate primary pulmonary high blood pressure. (Doc. 10-1, p. 406/420). Dr. Davis diagnosed venous insufficiency of both lower extremities, primary pulmonary hypertension, hypertension, asthma, and obesity. (Doc. 10-1, p. 406/420). Dr. Davis recommended that Holly elevate his feet one hour in the morning and one hour in the afternoon, and continue taking his medications (Lasix, potassium chloride, omeprazole, Advair, Spiriva, Ventolin, and Inderal). (Doc. 10-1, p. 408/421).

Dr. Ardoin evaluated Holly in August 2015 and found shortness of breath, dyspnea on exertion, pulmonary artery hypertension, atrial septal defect, asthma, and chronic obstructive pulmonary disease. (Doc. 10-1, p. 353/421). Dr. Ardoin noted

that, given Holly's hypertrophic cardiomyopathy and pulmonary hypertension, complicating obesity, and obstructive sleep apnea, Holly's condition could be made worse if the ASD was closed since it could be acting as a "pop off valve." (Doc. 10-1, p. 354/421). Dr. Ardoin prescribed a PDE5 inhibitor for his pulmonary hypertension. (Doc. 10-1, p. 349/421). Dr. Ardoin also stated that Holly is "completely disabled and unemployable at this time." (Doc. 10-1, p. 355/421).

In September 2015, Dr. Ardoin wrote that Holly is unable to perform physical labor due to severe exercise hypoxemia caused by a combination of pulmonary hypertension, atrial septal defect, hypertrophic cardiomyopathy, and severe persistent asthma. (Doc. 10-1, p. 410/421). A cardiopulmonary stress test documented severe hypoxemia with mild to moderate exercise. (Doc. 10-1, p. 410/421). Dr. Ardoin noted that Holly's cardiothoracic surgeon, cardiologist, and pulmonary hypertension specialist all concurred in his opinion. (Doc. 10-1, p. 410/421).

In November 2015, Dr. Ardoin found Holly still had significant dyspnea on exertion but his asthma had improved. (Doc. 10-1, p. 411/421). A transthoracic echocardiogram showed: a mildly dilated left ventricle with increased wall thickness and an estimated ejection fraction[3] of about 55%; a dilated left atrium; a mildly dilated right ventricle with mildly to moderately increased systolic pressure; mild

---

[3] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts…. A [left ventricle] ejection fraction of 55 percent or higher is considered normal." MEDLINEplus Health Information: Mayo Clinic, Ejection fraction: What does it measure?, *available at* https://www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-20058286?p=1.

regurgitation in the tricuspid valve; and a mildly dilated right atrium. (Doc. 10-1, pp. 414-15/421). Holly's pulmonary function tests showed moderately severe obstructive lung disease with asthma. (Doc. 10-1, p. 416/421).

**B.    Holly's March 2016 administrative hearing.**

At his administrative hearing in March 2016, Holly testified he was 43 years old, 5'9" tall, and weighed 310 pounds. (Doc. 10-1, p. 41/421). Holley testified he last worked on a land oil rig in December 2014. (Doc. 10-1, p. 41/421). Prior to that, Holly worked as a deckhand on a riverboat; worked in corrections; and worked at a plywood plant. (Doc. 10-1, p. 42/421).

Holly testified that his primary doctors are Dr. Ardoin (a pulmonologist) and Dr. Davis (a cardiologist). (Doc. 10-1, p. 48/421).

Holly testified he has COPD and asthma. (Doc. 10-1, p. 51/421). Holly takes Tudorza, Spiriva, and Albuterol inhalers, and Adcirca for pulmonary hypertension. (Doc. 10-1, p. 42/421). Holly testified those medications help. (Doc. 10-1, pp. 42-43/421). Holly testified he can walk for 10 to 15 minutes, stand for 15 to 30 minutes, and sit for up to 30 minutes. (Doc. 10-1, p. 43/421). Holly can lift 15 to 20 pounds. (Doc. 10-1, p. 43/421). If Holly walks too long or exerts himself, he suffers shortness of breath and fatigue and has to stop. (Doc. 10-1, pp. 46, 48/421). Holly also has trouble bending over, which makes it difficult to get dressed in the mornings. (Doc. 10-1, pp. 48-49/421). The problems that prevent Holly from working are fatigue and shortness of breath on exertion. (Doc. 10-1, p. 48/421). Sometimes he has "fairly severe" problems getting dressed in the morning, particularly when bending over.

9

(Doc. 10-1, pp. 48-49/421).  He had the same problems at work.  (Doc. 10-1, p. 49/421).  His medications have helped with the fatigue and shortness of breath.  (Doc. 10-1, p. 49/421).

Holly's right leg swells occasionally around his ankle.  (Doc. 10-1, p. 51/421).  Holly elevates his legs (above his heart) every day for an hour in the morning and an hour in the afternoon, as prescribed by Dr. Davis (Doc. 10-1, pp. 49-50/421), and when his leg swells.  (Doc. 10-1, p. 52/421).  Holly testified that elevating his legs helps (Doc. 10-1, p. 49/421).  Holly testified that his heart is overworked, one side is enlarged from working too hard, and the heart valve that was repaired still leaks.  (Doc. 10-1, pp. 50-51/421).  His doctors have talked to him about having another surgery on his heart.  (Doc. 10-1, p. 52/421).

Holly testified that he cooks, washes dishes, makes beds, sweeps, mops, does laundry, and goes shopping.  (Doc. 10-1, pp. 44-45/421).  Holly's 12-year-old son does the yard work.  (Doc. 10-1, pp. 44-45/421).  Holly watches about two hours of TV daily, goes to bed about 9:00 or 10:00 p.m., and gets up at 6:00 a.m.  (Doc. 10-1, p. 45/421).  Holly testified his three children, who are 12, 9, and 6 years old, live with him.  (Doc. 10-1, pp. 45-46/421).  Holly testified he does not have any income except food stamps and is insured by Medicaid.  (Doc. 10-1, p. 46/421).

Holly testified he cannot do sedentary work because it would involve sitting too long, which would make him stiff and sore and causes his right leg to swell.  (Doc. 10-1, p. 53/421).

The VE testified that Holly's past work as a: laborer was very heavy work with SVP 1; correction officer was medium work with SVP 4; deckhand was heavy work with SVP 4, and green chain off bearer was medium work with SVP 2. (Doc. 10-1, p. 54/421). The VE further testified that a claimant who is 43 years old, with 12 years of education, and with the ability to perform light work but must elevate his legs at least two times a day would not be able to do Holly's past work. (Doc. 10-1, p. 55/421). The VE also testified that that if such a person were to elevate his legs for only 30 minutes twice a day, he still would not be employable. (Doc. 10-1, p. 55/421).

## III. <u>Law and Analysis.</u>

### A. <u>Scope and standard of review.</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>See</u> <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>See</u> <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. <u>See</u> <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

11

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

**B.** **The ALJ erred in not crediting the opinions of Holly's treating physicians and in finding he has the residual functional capacity to perform the full range of light work.**

Holly contends the ALJ's reasons for not crediting the opinion of Dr. Davis, Holly's treating cardiologist, are not supported by substantial evidence. Specifically, Holly contends Dr. Davis advised him to elevate his legs for one hour twice a day, in the morning and evening to help with swelling. Holly argues the ALJ erred in finding Dr. Davis's opinion was not consistent with the evidence showing a normal ejection fraction, symptom improvements, and normal to mild findings that indicate no significant limitations. (Doc. 10/1, p. 26/421). Holly also contends the ALJ's finding

that he has the residual functional capacity to perform the full range of light work is not supported by the medical evidence.

Because the treating physician is most familiar with the claimant's impairments, his opinion should be accorded great weight in determining disability. See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir. 2011) (citing Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)).  If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)).  Likewise, when a treating physician has reasonable knowledge of the impairment, his opinion is given more weight than an opinion from a non-treating physician. See id.  By contrast, the Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise. See id. Treating physicians' opinions also receive greater weight "[w]hen the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." See id.

An ALJ "may reject the opinion of the treating physician *only* if the ALJ performs a *detailed analysis* of the treating physician's views under" the factors set out in 20 C.F.R. 404.1527 and 416.972.  See Beasley v. Barnhart, 191 Fed. Appx. 331 (5th. Cir. 2006) (emphasis in original); see also Giles, 433 Fed. Appx. at 246. Under the regulations, an ALJ is required to consider the physician's length of treatment of the claimant, the physician's frequency of examination, the nature and extent of the

treatment relationship, the support of the physician's opinion that is afforded by the medical evidence of record, the consistency of the opinion with the medical record, and finally, the physician's specialization. See Newton, 209 F.3d at 456; 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

Both of Holly's treating physicians–Dr. Davis, the cardiologist, and Dr. Ardoin, the pulmonologist–have emphatically stated that Holly cannot do labor-intensive work.  Dr. Davis also stated that Holly cannot climb stairs.  That limitation is supported by Dr. Ardoin's pulmonary function studies.  Dr. Davis further told Holly to elevate his legs twice a day for an hour due to swelling and chronic stasis changes with pitting edema in his right leg.  Neither physician stated whether Holly can or cannot do light or sedentary work.  The ALJ did not request physical residual functional capacity findings from either treating physician.  Nor did the ALJ order a consultative examination.[4]

Instead, the ALJ rejected the opinions of both physicians as to Holly's medical condition, and substituted his own opinion that, although Holly has respiratory impairments and obesity: (1) he does not have an atrial septal defect or hypertrophic cardiomyopathy; (2) his pulmonary hypertension, chronic stasis changes in the lower extremities, and obesity are not disabling; and (3) he has only "trivial" regurgitation

---

[4] The ALJ has the discretion to order a consultative examination.  An examination at government expense is not *required* unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.  See Anderson v. Bowen, 887 F.2d 630, 634 (5th Cir. 1989); see also Brock v. Chater, 84 F.3d 726 (5th Cir. 1996); Wren v. Sullivan, 925 F.2d 123, 127 (5th Cir. 1991); Haywood v. Sullivan, 888 F.2d 1463, 1472 (5th Cir. 1989).

in the mitral valve and tricuspid valve.[5]  (Doc. 10-1, p. 29/421).  The ALJ further found the physicians' opinions that Holly is disabled by his medical problems are overbroad and vague.  (Doc. 10-1, p. 29/421).  To support his findings, the ALJ stated:

> Progress notes dated June 4, 2015, by Wesley Davis, M.D., treating source, indicated the claimant was disabled due to pulmonary hypertension, chronic stasis changes right or [sic] the left lower extremity, obesity, ASD repair, and moderate pulmonary blood pressure.  The undersigned gives little weight to this opinion because it is not consistent with the record that shows normal ejection fraction and symptom improvements.  These show no more than normal to mild findings, which indicate no significant limitations….On August 31, 2015, the claimant reported improvement in his asthma….Records dated November 24, 2015 revealed the claimant's asthma had improved and he was sleeping with a CPAP.

(Doc. 10-1, p. 29/421).  The ALJ then found Holly has the residual functional capacity to do the full range of light work, without citing any supporting medical or other evidence for that finding.

A person's "residual functional capacity" is determined by combining a medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work.  See Bayer v. Colvin, 557 Fed. Appx. 280, 288 (5th Cir. 2014) (citing Hollis v. Bowen, 837 F.2d 1378, 1386–87 (5th Cir. 1988).  The residual functional capacity is based on all evidence, including medical evidence.  See Bayer, 557 Fed. Appx. at 288 (citing SSR

---

[5] ALJ's have been cautioned by the courts against "playing doctor" and making their own independent medical assessments.  See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2002).  An ALJ does not have the medical expertise to substitute his opinion as to the nature of a claimant's medical complaints for the supported and unrefuted diagnosis of the treating physician, particularly one who, as in this case, is a specialist.  See Frank, 326 F.3d at 622; Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901 (1991); see also Boulis-Gasche v. Commissioner of Social Security, 451 Fed. Appx. 488, 494 (6th Cir. 2011); Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009).

96–8p).   The Commissioner has the burden to establish a claimant's residual functional capacity.  See Greenspan, 38 F.3d at 237.

"Light work" is defined in 20 C.F.R. § 404.1567(b) and § 416.967(c) as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

An ALJ is free to reject a physician's opinion when good cause exists.  Giles, 433 Fed. Appx. at 246–47 (citing Newton, 209 F.3d at 455).  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise unsupported by the evidence.  See Giles, 433 Fed. Appx. at 246–47 (citing Newton, 209 F.3d at 456); see also Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995) (rejecting an "isolated, conclusory statement" of a treating physician when considered in conjunction with other opinions, objective medical evidence, and claimant's own testimony).

In this case, Dr. Ardoin and Dr. Davis both agree on the nature and extent of Holly's medical problems, and their opinions are supported by substantial medical evidence.  There is no medical (or other) evidence contradicting their opinions.

The ALJ erred in reinterpreting the medical test results and disagreeing with Holly's two treating specialist-physicians' findings as to the nature, extent, and effects of Holly's medical problems. The medical evidence does not support the ALJ's finding that Holly can walk and/or stand for up to six hours in an eight-hour day, as required for light work. The ALJ's findings as to Holly's residual functional capacity, based on only some of his medical problems, are not supported by substantial evidence.

Therefore, substantial evidence does not support the ALJ's/Commissioner's findings that Holly can perform the full range of light work and is not disabled. Substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law. Since the VE testified there are no jobs that Holly can do if he must elevate his legs twice a day, the evidence of record shows Holly is entitled to DIB.

Because there is no issue as to Holly's entitlement to DIB, Holly's case should be remanded to the Commissioner to determine the amount of his DIB.

C.    <u>The ALJ erred in finding Holly was not credible.</u>

Holly also contends the ALJ's findings as to his credibility are not supported by substantial evidence.

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. <u>See</u> <u>Loya v. Heckler</u>, 707 F.2d 211, 215 (5th Cir. 1983) (citing <u>Laffoon v. Califano</u>, 558 F.2d 253, 254-55 (5th Cir. 1977)); <u>see also</u> <u>Dominguez</u>

17

v. Astrue, 286 Fed. Appx. 182, 186 (5th Cir. 2008). A factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. Dominguez, 286 Fed. Appx. at 186 (citing Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. See Falco v. Shalala, 27 F.3d 160, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Holly's credibility (Doc. 10-1, pp. 26, 28-30/421):

> The record shows that the claimant did not need frequent physician intervention, hospitalization, or emergency room treatment for pulmonary hypertension, varicose veins, GERD, history of atrial septal defect repair, hypertrophic cardiomyopathy, obstructive sleep apnea, and asthma. Therefore, the undersigned concludes that the pulmonary hypertension, varicose veins, GERD, history of atrial septal defect repair, hypertrophic cardiomyopathy, obstructive sleep apnea, and asthma are nonsevere; that is, they cause such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience. [Doc. 10-1, p. 26/421].
>
> *        *        *
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. [Doc. 10-1, p. 28/421].
>
> *        *        *
>
> After considering all of the evidence, the claimant's subjective allegations were not found to be fully consistent with the medical evidence of record. [Doc. 10-1, p. 29/421].
>
> *        *        *
>
> Although the claimant has received treatment for COPD related symptoms, that treatment has been conservative and routine. The

claimant alleges to be in extreme distress, but he just has not received the type of medical treatment that one would expect for a completely disabled person, such as failed home supplemental oxygenation and exercise oxygenation intolerance.   This undermines the claimant's allegations that he is in extreme distress and incapable of performing any work.

Finally, in the credible medical evidence of record, the claimant's condition was noted to improve and objective testing showed results that were largely within normal limits…. [Doc. 10-1, p. 30/421].

The ALJ then reviewed the medical evidence though April 2015.  The ALJ did not review the medical evidence of June, August, September, and November of 2015.

The ALJ found Holly's physical complaints are non-severe because he did not visit the doctor often.[6]  However, the record shows Holly had 15 doctor visits between May 2014 and November 2015, and he underwent many tests.  That is not infrequent. The ALJ erred in finding Holly did not see his doctors very often.

---

[6] Social Security Ruling ("SSR") 96-7p permits adjudicators to find a claimant less credible for inconsistent treatment and non-compliance with treatment.  However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  See SSR 96-7p, 1996 WL 374186, at *7.  SSR 96-7p also specifically notes that an "individual may be unable to afford treatment and may not have access to free or low-cost medical services." See id. at *8; see also Brillinger v. Colvin, 2015 WL 5598968, at *10 (E.D. La. 2015); Mason v. Comm'r of Soc. Sec. Admin., 2009 WL 400831, at *9 (N.D. Tex. 2009).

It is well-documented in the record that Holly was laid off from his work offshore and lost his medical insurance.  (Doc. 10-1, p. 26/421).  On January 27, 2015, Dr. Ardoin stated that the loss of insurance would affect Holly's medical care.  (Doc. 10-1, pp. 259, 292, 357/421).  In June 2015, Dr. Davis also noted the fact that Holly had been laid off from work.  (Doc. 10-1, p. 312/421).  The ALJ did not discuss this when he stated Holly had not seen his doctors very often.

Therefore, the ALJ's reasoning and finding that Holly was not credible are not supported by substantial evidence.

## IV.   Conclusion.

Because the ALJ/Commissioner erred in finding Holly is not disabled, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED, that Holly be AWARDED DISABILITY INSURANCE BENEFITS, and that Holly's case be REMANDED to the Commissioner for a determination as to the amount of his benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this

___31st___ day of January, 2019.

Joseph H.L. Perez-Montes
United States Magistrate Judge